**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CALL OF THE WILD MOVIE, LLC, <br><br> Plaintiff, <br><br> v. <br> DOES 1-1,062, <br><br> Defendants. | Civil Action No. 10-455 (BAH) <br> Judge Beryl A. Howell |
| MAVERICK ENTERTAINMENT GROUP, INC., <br><br> Plaintiff, <br><br> v. <br> DOES 1-4,350, <br><br> Defendants. | Civil Action No. 10-569 (BAH) <br> Judge Beryl A. Howell |
| DONKEYBALL MOVIE, LLC, <br><br> Plaintiff, <br><br> v. <br> DOES 1-171, <br><br> Defendants. | Civil Action No. 10-1520 (BAH) <br> Judge Beryl A. Howell |

**MEMORANDUM OPINION**

Currently before the Court are Time Warner Cable's (hereinafter "Time Warner")

Motions to Quash or Modify subpoenas that were issued in three pending copyright infringement

cases: *Call of the Wild Movie, LLC v. Does 1-1,062*, No. 10-cv-455 (hereinafter "*Wild*");

*Maverick Entertainment Group, Inc. v. Does 1-4,350*, No. 10-cv-569 (hereinafter "*Maverick*");

and *Donkeyball Movie, LLC v. Does 1-117*, No. 10-cv-1520 (hereinafter "*Donkeyball*"). In the

interest of judicial economy, this Memorandum Opinion will address and resolve the issues

1

related to Time Warner's motions to quash pending before the Court in all three of the captioned actions. In so doing, however, the Court emphasizes that these cases have not been consolidated for any purpose. This Memorandum Opinion, moreover, should in no way leave the parties with the impression that the Court views these cases as inextricably related; rather, with respect to Time Warner's pending motions to quash, the relevant factual allegations, legal theories and asserted burdens are the same and may be addressed in a unitary opinion.

Time Warner claims that the subpoenas issued to it in each of the three cases should be quashed due to the undue burden that Time Warner faces with compliance. *Wild*, ECF No. 7, May 13, 2010; *Maverick*, ECF No. 18, Nov. 22, 2010; *Donkeyball*, ECF No. 7, Dec. 13, 2010. Alternatively, Time Warner argues that the subpoenas should be substantially modified to require production of the requested information on a schedule that would likely take about three years. *See* Time Warner Mem. Supp. Mot. Quash, *Wild*, at 11, ECF No. 7 (requesting the Court to modify subpoena to limit Time Warner's production responsibilities to 28 IP addresses a month); *see generally* Time Warner Mem. Supp. Mot. Quash, *Maverick*, ECF No. 18, at 4-5; Time Warner Mem. Supp. Mot. Quash, *Donkeyball*, ECF No. 7, at 4-5. After reviewing Time Warner's Motions, the plaintiffs' opposition papers, the amicus briefs, supplemental filings, as well as the accompanying declarations and applicable law, the Court denies Time Warner's motions to quash in *Wild* and *Donkeyball* and grants Time Warner's Motion to Quash in *Maverick* because the plaintiff failed to serve Time Warner with its subpoena in accordance with Federal Rule of Civil Procedure 45(b).

## I. FACTUAL AND PROCEDURAL BACKGROUND

*Wild, Maverick*, and *Donkeyball* are cases in which copyright owners of separate movies allege that their copyrights are being infringed in the same manner. Specifically, the plaintiffs

allege that varying numbers of defendants, who are currently unnamed, are illegally downloading and distributing copyrighted works using a file-sharing protocol called BitTorrent. In *Wild,* the Amended Complaint, filed on May 12, 2010, accuses 1,062 unnamed Doe defendants of infringing the copyright of the motion picture *Call of the Wild*. *Wild*, ECF No. 6.  In *Maverick,* the Amended Complaint, filed on August 10, 2010, accuses 4,350 unnamed Doe defendants of infringing the copyrights of the motion pictures *13 Hours in a Warehouse, A Numbers Game, Border Town, Deceitful Storm, Fast Track No Limits, He Who Finds a Wife, Hellbinders, Locator 2, Smile Pretty (aka Nasty), Stripper Academy, The Casino Job, The Clique (aka Death Clique),* and *Trunk*. *Maverick*, ECF No. 9.  In *Donkeyball,* the Complaint, filed on September 8, 2010, accuses 171 unnamed Doe defendants of infringing the copyrights of the motion picture *Familiar Strangers*. *Donkeyball*, ECF No. 1.

The putative defendants in each case are alleged to have used a file sharing protocol called BitTorrent, which allows users to share files anonymously with other users.  When a user downloads a specific file through BitTorrent -- in this case, plaintiffs' copyrighted motion pictures -- data is transferred in a "piecemeal" fashion whereby "a different piece of the data [is received] from each user who has already downloaded the file . . . ."  Amended Compl., *Wild,* ¶ 3, ECF No. 6; Amended Compl., *Maverick*, ¶ 3, ECF No. 9; Compl., *Donkeyball,* ¶ 3, ECF No. 1; *see also* Pl.'s Mot. Leave to Take Disc. Prior to Rule 26(f) Conference, *Wild*, ECF No. 2, Benjamin Perino Decl., ¶¶ 7-8; Pl.'s Mot. Leave to Take Disc. Prior to Rule 26(f) Conference, *Maverick*, ECF No. 4, Benjamin Perino Decl., ¶¶ 7-8; Pl.'s Mot. Leave to Take Disc. Prior to Rule 26(f) Conference, *Donkeyball*, ECF No. 4, Benjamin Perino Decl., ¶¶ 7-8. The nature of the BitTorrent file-sharing technology "makes every downloader also an uploader of the illegally transferred file(s)." Amended Compl., *Wild*, ¶ 3, ECF No. 6; Amended Compl., *Maverick*, ¶ 4,

3

ECF No. 9; Compl., *Donkeyball,* ¶ 4, ECF No. 1. Since users download material from a number of other individuals, "every infringer is simultaneously stealing copyrighted material from many ISPs in numerous jurisdictions around the country." Amended Compl., *Wild*, ¶ 4, ECF No. 6; Amended Compl., *Maverick*, ¶ 4, ECF No. 9; Compl., *Donkeyball*, ¶ 4, ECF No. 1.

In an effort to combat illegal transfer of their copyrighted movies, the plaintiffs in *Wild, Maverick*, and *Donkeyball* contracted with Guardaley Limited, an anti-piracy firm that uses proprietary technology to identify BitTorrent users sharing the plaintiffs' copyrighted works. *See* Pl.'s Mot. Leave to Take Disc. Prior to Rule 26(f) Conference, *Wild*, ECF No. 2, Benjamin Perino Decl., ¶ 10.[1] The plaintiffs assert that Guardaley was able to identify the users that were illegally sharing the plaintiffs' motion pictures, and then provided the plaintiffs with the alleged infringers' Internet Protocol (IP) addresses, as well as the date and time the alleged infringement activity occurred. *Id.*; *see also* Pl.'s Mot. Leave to Take Disc. Prior to Rule 26(f) Conference, *Wild*, ECF No. 2, Patrick Achache Decl., at ¶¶ 13-14. The difficulty for the plaintiffs, however, is that they have no identifying information for these alleged infringers aside from the IP addresses that Guardaley supplied.

To obtain certain identifying information for the putative defendants, plaintiffs moved for expedited discovery. Pl.'s Mot. Leave to Take Disc. Prior to Rule 26(f) Conference, *Wild*, ECF No. 2; Pl.'s Mot. Leave to Take Disc. Prior to Rule 26(f) Conference, *Maverick*, ECF No. 4; Pl.'s Mot. Leave to Take Disc. Prior to Rule 26(f) Conference, *Donkeyball*, ECF No. 4. The Court in each case granted plaintiffs leave to subpoena Internet Service Providers (ISPs) to compel production of the names, addresses, emails, phone numbers, and Media Access Control numbers

---

[1] For clarity, this opinion will cite primarily to material docketed in *Wild*, No. 10-cv-455. Plaintiffs are represented by the same counsel, and the plaintiffs and Time Warner's briefs and filings in *Wild, Maverick,* and *Donkeyball* generally assert the same claims and factual matters, differing only in the copyrighted material at issue, the putative defendants and, in *Maverick*, assertion of a jurisdictional basis for quashing the subpoena. Any other differences will be noted in the opinion.

associated with the alleged infringing IP addresses that the plaintiffs identified as engaging in infringing distribution of their respective movies. Order Granting Pl.'s Mot. for Leave to Take Disc. Prior to Rule 26(f) Conference, *Wild*, Apr. 15, 2010, ECF No. 4 (Urbina, J.); Order Granting Pl.'s Mot. for Leave to Take Disc. Prior to Rule 26(f) Conference, *Maverick*, No. 10-569, May, 24 2010, ECF No. 7 (Leon, J.); Order Granting Pl.'s Mot. for Leave to Take Disc. Prior to Rule 26(f) Conference, *Donkeyball*, Oct. 19, 2010, ECF No. 6 (Sullivan, J.). Time Warner received subpoenas for information relating to 224 Time Warner subscribers in *Wild*, 783 subscribers in *Maverick*, and 21 subscribers in *Donkeyball*. Time Warner Mot. Quash, *Wild*, ECF No. 7, Ex. 1; Time Warner Mot. Quash, *Maverick,* ECF No. 18, Ex. 1; Time Warner Mot. Quash, *Donkeyball,* ECF No. 7, Ex. 1. Time Warner responded by moving to quash the subpoenas on grounds that producing the requested information would impose an undue burden and expense. *Wild*, May 13, 2010, ECF No. 7; *Maverick*, Nov. 22, 2010, ECF No. 18; *Donkeyball,* Dec. 13, 2010, ECF No. 7. In support of Time Warner's motion to quash in *Wild*, amicus briefs were submitted collectively by Electronic Frontier Foundation, Public Citizen, American Civil Liberties Union Foundation, and American Civil Liberties Union of the Nation's Capital. Minute Order, *Wild*, dated Jan. 3, 2011 (granting Amici leave to file amicus brief) (Urbina, J.). Amici urge the Court to quash the subpoena issued to Time Warner based upon improper joinder, lack of personal jurisdiction over the putative defendants, and the putative defendants' First Amendment right to anonymity.

Following re-assignment to this Court, on March 1, 2011, the Court held a joint conference in these cases to hear oral argument on Time Warner's motions. Time Warner,

Amici, the plaintiffs, and an attorney representing three putative defendants participated.[2] At the conference, the Court stated that it would accept supplemental filings in the case in order to more fully develop the record on the burdens faced by Time Warner.[3] *See* Minute Order, *Wild*, March 9, 2011. Amici, plaintiffs, and Time Warner each filed supplemental material.

If the Court were to accept the Amici's arguments, not only would the Court quash the subpoenas directed toward Time Warner, but plaintiffs' cases would face significant obstacles.[4] For this reason, the Court addresses Amici's contentions before turning to Time Warner's arguments in support of quashing or modifying the plaintiffs' subpoenas.

## II.   AMICI'S CONTENTION THAT THE PUTATIVE DEFENDANTS ARE IMPROPERLY JOINED

Amici argue that the Court should quash the subpoenas directed to Time Warner because the plaintiffs have improperly joined the putative defendants.  *See* FED. R. CIV. P. 20(a)(2).  For the reasons stated below, the Court finds that the plaintiffs' allegations against the putative defendants in each case meet the requirements for permissive joinder.  After the putative

---

[2] Counsel identified his clients in *Maverick* as Lori Pearlman, Calvin Johnson, and Xu Xiangping.  Transcript of Mot. Hearing, at 52-53, *Call of the Wild Movie LLC v. Does 1-1,063*, No. 10-cv-455 (Mar. 1, 2011)

[3] Counsel for Time Warner was unable to address certain questions posed by the Court during oral argument on Time Warner's Motions to Quash:
"MR. MALTAS: Well, as to the specifics of what's done in each location, I grant I'm not sure I can answer the question of what is done specifically at the central office and what is done specifically at regional offices. I do know that it requires work at both, and it requires --…-- people at both.
THE COURT:  One of the declarations said that at the regional office, it takes about 20 minutes per IP look-up to do something, but it doesn't exactly explain … what takes 20 minutes per IP look-up? What are they doing that takes 20 minutes?
MR. MALTAS: I don't want to give an answer that is not technically correct, and I don't know the answer to that, so I can go back and we can file a supplemental affidavit, if that would help the Court."
Transcript of Mot. Hearing, at 27-28, Call of the Wild Movie LLC v. Does 1-1,063, No. 10-cv-455 (Mar. 1, 2011).

[4] Time Warner also raises the argument that its burdens are caused by the plaintiffs' "failure to observe jurisdictional limitations and improper joinder."  Time Warner Mem. Supp. Mot. Quash, *Maverick*, at 13-15 (addressing joinder and personal jurisdiction issues); Time Warner Mem. Supp. Mot. Quash, *Donkeyball*, at 13-15 (addressing joinder and personal jurisdiction issues); *see also* Time Warner Mem. Supp. Mot. Quash, *Wild*, at 10 (addressing joinder). Time Warner does not argue, however, that it is precluded from producing its subscribers' identifying information due to the putative defendants' First Amendment right to anonymity.  The Court addresses these issues *sua sponte* under its duty to supervise discovery in these cases. *See* FED. R. CIV. P. 26(b)(2)(C) ("On motion or *on its own*, the court must limit the frequency or extent of discovery otherwise allowed by these rules…")(emphasis added).

defendants have been identified and named in the Complaints, the defendants may raise the argument that they are improperly joined under Federal Rule of Civil Procedure 20 and move to sever the joined defendants under Federal Rule of Civil Procedure 21. Severance at this stage, however, as numerous other courts both in and outside this District have held, is premature. *See, e.g., Achte/Neunte Boll Kino Beteiligungs GMBH & Co, KG v. Does 1 - 4,577*, No. 10-cv-00453, ECF No. 34 (D.D.C. July 2, 2010) (Collyer, J.); *West Bay One, Inc. v. Does 1-1653*, No. 10-cv-00481, ECF No. 25 (D.D.C. July 2, 2010) (Collyer, J.); *Arista Records LLC v. Does 1-19*, 551 F. Supp. 2d 1, 11 (D.D.C. 2008) (Kollar-Kotelly, J.); *London-Sire Records, Inc. v. Doe 1*, 542 F. Supp. 2d 153, 161 n.7 (D. Mass. 2008); *Sony Music Entm't, Inc. v. Does 1-40*, 326 F. Supp. 2d 556, 568 (S.D.N.Y. 2004).

## A. LEGAL STANDARD

Under the Federal Rules of Civil Procedure, defendants may be joined in one action when claims arise from the same transaction or occurrence or series of transactions or occurrences; and any question of law or fact in the action is common to all defendants. FED. R. CIV. P. 20(a)(2); *see also Montgomery v. STG Int'l, Inc.*, 532 F. Supp. 2d 29, 35 (D.D.C. Jan. 30, 2008) (interpreting Rule 20(a)(1), which has the same requirements as Rule 20(a)(2)).

Permissive joinder is appropriate "to promote trial convenience and expedite the final resolution of disputes, thereby preventing multiple lawsuits, extra expense to the parties, and loss of time to the court as well as the litigants appearing before it." *M.K. v. Tenet*, 216 F.R.D. 133, 137 (D.D.C. 2002). The requirements for permissive joinder are "liberally construed in the interest of convenience and judicial economy in a manner that will secure the just, speedy, and inexpensive determination of the action." *Lane v. Tschetter*, No. 05-1414, 2007 WL 2007493, at *7 (D.D.C. July 10, 2007) (quoting *Jonas v. Conrath*, 149 F.R.D. 520, 523 (S.D. W.Va. 1993));

*see also Davidson v. District of Columbia*, 736 F. Supp. 2d 115, 119 (D.D.C. 2010). Thus, "the impulse is toward entertaining the broadest possible scope of action consistent with fairness to the parties; [and] joinder of claims, parties, and remedies is strongly encouraged." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 724 (1966).

The remedy for improper joinder is severance under Federal Rule of Civil Procedure 21. This rule does not set forth what constitutes misjoinder, but "it is well-settled that parties are misjoined when the preconditions of permissive joinder set forth in Rule 20(a) have not been satisfied." *Disparte v. Corporate Exec. Bd.*, 223 F.R.D. 7, 12 (D.D.C. 2004) (quoting *Puricelli v. CNA Ins. Co.*, 185 F.R.D. 139, 142 (N.D.N.Y. 1999)). Courts have also read Rule 21 in conjunction with Rule 42(b), which allows the court to sever claims in order to avoid prejudice to any party. *Tenet*, 216 F.R.D. at 138 (citing *Brereton v. Commc'ns Satellite Corp.,* 116 F.R.D. 162, 163 (D.D.C.1987)); *see also* FED. R. CIV. P. 42(b) ("For convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues, claims, crossclaims, counterclaims, or third-party claims."). In addition to the two requirements of Rule 20(a)(2), the Court therefore also considers whether joinder would prejudice any party or result in needless delay. *See Lane,* 2007 WL 2007493, at \*7; *Tenet*, 216 F.R.D. at 138.

**B. DISCUSSION**

Consideration of the two requirements for permissive joinder under Rule 20(a)(2) and their application to the allegations in the Complaints in *Wild*, *Maverick*, and *Donkeyball* make clear that, at this procedural juncture, joinder of the putative defendants is proper. Joinder will avoid prejudice and needless delay for the only party currently in the case, namely the plaintiff, and promote judicial economy.

*1. Same Transaction, Occurrence, or Series of Transactions or Occurrences*

Rule 20(a)(2)(A) states that joinder is proper if "any right to relief is asserted against [the joined defendants] jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences." This essentially requires claims asserted against joined parties to be "logically related." *Disparte*, 223 F.R.D. at 10. This is a flexible test and courts seek the "broadest possible scope of action." *Lane*, 2007 WL 2007493, at *7 (quoting *Gibbs*, 383 U.S. at 724). In the present case, the plaintiffs allege that the putative defendants in each case used the BitTorrent file-sharing protocol to illegally distribute the plaintiffs' motion pictures. Amended Compl., *Wild*, ECF No. 6, ¶12. Amici counter, however, that engaging in "separate but similar behavior by individuals allegedly using the Internet to commit copyright infringement" does not satisfy Rule 20(a)(2)(A)'s requirement that the claim asserted against the joined defendants arise out of the same transaction, occurrence, or series of transactions or occurrences. Mem. of Amici Curiae Electronic Frontier Foundation, Public Citizen, American Civil Liberties Union Foundation and American Civil Liberties Union of the Nation's Capital in Supp. Time Warner's Mot. Quash, *Wild* (hereinafter "Amici Mem."), at 11-12, ECF No. 18. Despite Amici's arguments, at this nascent stage of the case, the plaintiffs have sufficiently alleged that the infringing activity at issue in each of the cases may involve multiple computers, based in various jurisdictions, which are using the BitTorrent protocol to make available for sharing the same copyrighted content.

Specifically, the plaintiffs allege that the BitTorrent file-sharing protocol "makes every downloader also an uploader of the illegally transferred file(s). This means that every "node" or peer user who has a copy of the infringing copyrighted material on a torrent network must necessarily also be a source of download for that infringing file." Amended Compl., *Wild*, ¶3, ECF No. 6. The plaintiffs further assert that the "nature of a BitTorrent protocol [is that] any

seed peer that has downloaded a file prior to the time a subsequent peer downloads the same file is automatically a source for the subsequent peer so long as that first seed peer is online at the time the subsequent peer downloads a file." *Id.* at ¶ 4.

Based on these allegations, the plaintiffs' claims against the defendants are logically related. Each putative defendant is a possible source for the plaintiffs' motion pictures, and may be responsible for distributing the motion pictures to the other putative defendants, who are also using the same file-sharing protocol to copy the identical copyrighted material. *See Disparte*, 223 F.R.D. at 10 (to satisfy Rule 20(a)(2)(A) claims must be "logically related" and this test is "flexible."). While the defendants may be able to rebut these allegations later, the plaintiffs have sufficiently alleged that their claims against the defendants potentially stem from the same transaction or occurrence, and are logically related. *See Arista Records LLC v. Does 1-19,* 551 F. Supp. 2d 1, 11 (D.D.C.) ("While the Courts notes that the remedy for improper joinder is severance and not dismissal, . . . the Court also finds that this inquiry is premature without first knowing Defendants' identities and the actual facts and circumstances associated with Defendants' conduct.").

*2. Question of Law or Fact Common to All Defendants*

Rule 20(a)(2)(B) requires the plaintiffs' claims against the putative defendants to contain a common question of law or fact. *See Disparte*, 223 F.R.D. at 11. The plaintiffs meet this requirement. In each case, the plaintiff will have to establish against each putative defendant the same legal claims concerning the validity of the copyrights in the movies at issue and the infringement of the exclusive rights reserved to the plaintiffs as copyright holders.

Furthermore, the plaintiffs allege that the putative defendants utilized the same BitTorrent file-sharing protocol to illegally distribute and download the plaintiffs' motion pictures and,

10

consequently, factual issues related to how BitTorrent works and the methods used by plaintiffs to investigate, uncover and collect evidence about the infringing activity will be essentially identical for each putative defendant. Amended Compl., *Wild*, ¶ 3; Amended Compl, *Maverick*, ¶ 3; Compl., *Donkeyball*, ¶ 3.

The Court recognizes that each putative defendant may later present different factual and substantive legal defenses but that does not defeat, at this stage of the proceedings, the commonality in facts and legal claims that support joinder under Rule 20(a)(2)(B).

### 3. *Prejudice to Any Party or Needless Delay*

Finally, the Court must assess whether joinder would prejudice the parties or result in needless delay. At this stage in the litigation, the Court believes it will not. To the contrary, joinder in a single case of the putative defendants who allegedly infringed the same copyrighted material promotes judicial efficiency and, in fact, is beneficial to the putative defendants. *See London-Sire Records, Inc. v. Doe 1*, 542 F. Supp. 2d 153, 161 (D. Mass. 2008) (court consolidated separate Doe lawsuits for copyright infringement since the "cases involve similar, even virtually identical, issues of law and fact: the alleged use of peer-to-peer software to share copyrighted sound recordings and the discovery of defendants' identities through the use of a Rule 45 subpoena to their internet service provider. Consolidating the cases ensures administrative efficiency for the Court, the plaintiffs, and the ISP, and allows the defendants to see the defenses, if any, that other John Does have raised.").

Notably, as part of the motion to modify the subpoena, Time Warner asks the Court to intervene in a cost dispute with plaintiffs' counsel and require payment for each IP address for which the subpoena requires identifying information rather than payment per customer. Time Warner Mem. Supp. Mot. Quash, *Wild*, at 12, ECF No. 7. The import of this request is that

11

some IP addresses may relate to the same person, who is engaged in the allegedly infringing activities claimed by plaintiffs. Severance of the putative defendants associated with different IP addresses may subject the same Time Warner customer to multiple suits for different instances of allegedly infringing activity and, thus, would not be in the interests of the putative defendants.

Moreover, the putative defendants are currently identified only by their IP addresses and are not named parties. Consequently, they are not required to respond to the plaintiffs' allegations or assert a defense. The defendants may be able to demonstrate prejudice once the plaintiffs proceed with their cases against them, but they cannot demonstrate any harm that is occurring to them before that time.

The plaintiffs, by contrast, are currently obtaining identifying information from ISPs so that they can properly name and serve the defendants. If the Court were to consider severance at this juncture, plaintiffs would face significant obstacles in their efforts to protect their copyrights from illegal file-sharers and this would only needlessly delay their cases. The plaintiffs would be forced to file 5,583 separate lawsuits, in which they would then move to issue separate subpoenas to ISPs for each defendant's identifying information. Plaintiffs would additionally be forced to pay the Court separate filing fees in each of these cases, which would further limit their ability to protect their legal rights. This would certainly not be in the "interests of convenience and judicial economy," or "secure a just, speedy, and inexpensive determination of the action." *Lane*, 2007 WL 2007493, at *7 (declining to sever defendants where "parties joined for the time being promotes more efficient case management and discovery" and no party prejudiced by joinder).

Given the administrative burden of simply obtaining sufficient identifying information to properly name and serve alleged infringers, it is highly unlikely that the plaintiffs could protect

their copyrights in a cost-effective manner. Indeed, Time Warner urges the Court to sever the defendants for this very reason. Time Warner asserts that, if joinder were disallowed, its burden of complying with subpoenas would be diminished because the plaintiffs would not be able to proceed against all of the putative defendants individually. *See* Transcript of Mot. Hearing, 14-16, Call of the Wild Movie LLC v. Does 1-1,063, No. 10-cv-455 (Mar. 1, 2011).

At this procedural juncture, the plaintiffs have met the requirements of permissive joinder under Rule 20(a)(2). The putative defendants are not prejudiced but likely benefited by joinder, and severance would debilitate the plaintiffs' efforts to protect their copyrighted materials and seek redress from the putative defendants who have allegedly engaged in infringing activity. Courts are instructed to "entertain[] the broadest possible scope of action consistent with fairness to the parties.'" *Lane*, 2007 WL 2007493, at *7. While this Court is fully cognizant of the logistical and administrative challenges of managing a case with numerous putative defendants, a number of whom may seek to file papers *pro se*, severing the putative defendants is no solution to ease the administrative burden of the cases. The Court therefore declines to sever the putative defendants at this time.

## III. AMICI'S CONTENTION THAT THE COURT DOES NOT HAVE PERSONAL JURISDICTION OVER THE PUTATIVE DEFENDANTS

Amici further argue that the Court should quash the subpoenas issued to Time Warner because the plaintiffs have failed to properly establish personal jurisdiction over each putative defendant. Amici contend that the plaintiffs "failed to allege specific facts" to support jurisdiction and that the likelihood of the defendants uploading or downloading the plaintiffs' copyrighted movies in the District of Columbia is "exceedingly small." Amici Reply Brief, at 5-6, ECF No. 22. Given that the defendants have yet to be identified, the Court believes that evaluating the defendants' jurisdictional defenses at this procedural juncture is premature.

**A. LEGAL STANDARD**

To establish personal jurisdiction, the Court must examine whether jurisdiction is applicable under the District of Columbia's long-arm statute, D.C. CODE § 13-423, and must also determine whether jurisdiction satisfies the requirements of due process. *See GTE New Media Services Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1347 (D.C. Cir. 2000). Due Process requires the plaintiff to show that the defendant has "minimum contacts" with the forum, thereby ensuring that "the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980); *see also GTE New Media Servs.*, 199 F.3d at 1347.

In cases where a party's contacts with the jurisdiction are unclear and the record before the court is "plainly inadequate," courts have allowed for a discovery period within which to gather evidence to support jurisdiction. *See GTE New Media Servs.*, 199 F.3d at 1351-52 (reversing lower court's finding of personal jurisdiction, but stating that "[t]his court has previously held that if a party demonstrates that it can supplement its jurisdictional allegations through discovery, then jurisdictional discovery is justified."). "This Circuit's standard for permitting jurisdictional discovery is quite liberal," *Diamond Chem. Co. v. Atofina Chems., Inc.*, 268 F. Supp. 2d 1, 15 (D.D.C. 2003), and jurisdictional discovery is available when a party has "at least a good faith belief" that it has personal jurisdiction. *Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080, 1090 (D.C. Cir. 1998). Courts have permitted discovery even when a party has failed to establish a prima facie case of personal jurisdiction. *See GTE New Media Servs.*, 199 F.3d at 1351-52 (". . . as the record now stands, there is absolutely no merit to [plaintiff]'s bold claim that the parent companies and subsidiaries involved in this lawsuit should be treated identically. Jurisdictional discovery will help to sort out these

14

matters."); s*ee also In re Vitamins Antitrust Litigation*, 94 F. Supp. 2d 26, 35 (D.D.C. 2000) (discussing *GTE New Media Servs.* and stating that "the D.C. Circuit held that although plaintiffs had failed to establish a prima facie case of personal jurisdiction and the court was unable to tell whether jurisdictional discovery would assist GTE on this score, plaintiffs were entitled to pursue [discovery].").  In such cases, a party is entitled to pursue "precisely focused discovery aimed at addressing matters relating to personal jurisdiction." *GTE New Media Services, Inc.*, 199 F.3d at 1351-52.

**B.  DISCUSSION**

Amici argue that the plaintiffs have failed to demonstrate with sufficient specificity the basis for personal jurisdiction for each defendant.  To be sure, such a showing is certainly required when parties are identified and named. The Court would then be able to evaluate personal jurisdiction defenses.  The present situation, however, is different. Here, the plaintiffs have only limited information about the putative defendants, namely their IP addresses and information about the methodology used to engage in allegedly infringing activity. *See Id.* at 1352 (record before the court was "plainly inadequate" and "[j]urisdictional discovery will help to sort out these matters.").  Without additional information, the Court has no way to evaluate the defendants' jurisdictional defenses. *See, e.g., London-Sire Records, Inc. v. Doe 1*, 542 F. Supp. 2d 153, 180-181 (D. Mass. 2008) ("premature to adjudicate personal jurisdiction" and permitting plaintiff to engage in jurisdictional discovery); *Sony Music Entm't, Inc. v. Does 1-40*, 326 F. Supp. 2d. 556, 567 (S.D.N.Y. 2004) (evaluating personal jurisdiction premature without defendants' identifying information).

Amici contend that the plaintiffs do not have a "good faith" basis to assert personal jurisdiction over the putative defendants, and the Court should therefore not allow the defendants

to proceed with discovery.  According to Amici, such a good faith basis could be established by reliance upon geolocation information embedded in each IP address.  Specifically, Amici assert that IP addresses can be used to detect an individual's location and the plaintiffs should be forced to justify the putative defendants' personal jurisdiction by using tools "freely available to the public [that] help reveal where a person using a particular IP address is likely to be physically located."  Amici Mem., at 5. Amici cite 'reverse domain name service lookup' ("reverse DNS") and the American Registry for Internet Numbers (the "ARIN database") as tools that would help reveal where a specific IP address is "likely to be physically located." Amici Mem., *Wild*, ECF No. 11, Seth Schoen Decl., at ¶¶ 5, 13.

The Court rejects this argument for three reasons. First, as the Amici concede, publicly available IP lookups reveal only where a defendant is "likely" to be located.  *Id.* at ¶ 4.  Given that these lookup tools are not completely accurate, this does not resolve the question of whether personal jurisdiction would be proper. Ultimately, the Court would still be unable to properly evaluate jurisdictional arguments until the putative defendants are properly identified and named. *See Sony,* 326 F. Supp. 2d. at  567-68 ("Assuming personal jurisdiction were proper to consider at this juncture, the [publicly available IP lookup] techniques suggested by amici, at best, suggest the mere 'likelihood' that a number of defendants are located [outside this jurisdiction].  This, however, does not resolve whether personal jurisdiction would be proper.").

Second, the nature of the BitTorrent technology enables every user of the file-sharing protocol to access copyrighted material from other peers, who may be located in multiple jurisdictions "around the country," including this one. Amended Compl., *Wild*, ECF No. 6,  ¶ 4. Amici raise the prospect that the consequence of this theory is that any Internet user may be haled into court in any jurisdiction in the country for any online activity. Transcript of Mot.

Hearing at 34-35, Call of the Wild Movie LLC v. Does 1-1,063, No. 10-cv-455 (Mar. 1, 2011) ("If merely placing information online were enough to establish personal jurisdiction in the District or anyplace their information could be obtained and downloaded and accessed, the limits on personal jurisdiction would be abolished."). While that broad prospect would indeed be troubling, that is not the situation here. *See generally GTE New Media Servs.*, 199 F.3d at 1350 ("[T]he advent of advanced technology, say, as with the Internet, should [not] vitiate long-held and inviolate principles of federal court jurisdiction."). The allegations in the Complaints in *Wild, Maverick* and *Donkeyball* do not involve general Internet access, but specific use of a file-sharing protocol that may touch multiple jurisdictions to effectuate a download of a single copyrighted work. Moreover, so far, no putative defendant has been named or "haled" before this Court. The plaintiffs in each case will be able to proceed only against those named defendants over whom this Court has personal jurisdiction.

Finally, at this juncture when no putative defendant has been named, the Court has limited information to assess whether any putative defendant has a viable defense of lack of personal jurisdiction or to evaluate possible alternate bases to establish jurisdiction. *See, e.g., London-Sire Records, Inc.*, 542 F. Supp. 2d at 181 ("Even taking all of the facts in [the putative defendant's] affidavit as true, it is possible that the Court properly has personal jurisdiction."); *Humane Soc'y of the United States v. Amazon.com, Inc.*, No. 07-623, 2007 U.S. Dist. LEXIS 31810, at *10 (D.D.C. May 1, 2007) ("[A] plaintiff faced with a motion to dismiss for lack of personal jurisdiction is entitled to reasonable discovery, lest the defendant defeat the jurisdiction of a federal court by withholding information on its contacts with the forum," quoting *Virgin Records Am., Inc. v. Does 1-35,* No. 05-1918, 2006 WL 1028956, at *3 (D.D.C. Apr. 18, 2006)). Certainly, the Court concurs with Amici that the putative defendants deserve to have dispositive

issues, such as personal jurisdiction, decided promptly. Amici Reply Brief, *Wild*, ECF No. 22, at 10. When the defendants are named, they will have the opportunity to file appropriate motions challenging the Court's jurisdiction and that will be the appropriate time to consider this issue. *See Virgin Records,* 2006 WL 1028956, at *3 (Amici's personal jurisdiction arguments rejected since "Defendant's Motion to Quash is without merit [] because it is premature to consider the question of personal jurisdiction in the context of a subpoena directed at determining the identity of the Defendant," citing *Elektra Entm't Grp., Inc. v. Does 1-9*, No. 04-2289, 2004 WL 2095581, at *5 (S.D.N.Y. Sept. 8, 2004); *Sony,* 326 F. Supp. 2d 556, 567-68 (S.D.N.Y.2004); *UMG Recordings v. Does 1-199*, No. 04-0093, at *2 (D.D.C. Mar. 10, 2004)).

The Court and parties are in no position yet to evaluate each putative defendant's specific connection with this jurisdiction. Quashing the subpoenas would effectively bar the plaintiffs' from obtaining discovery pertinent to that evaluation, and this Court declines to cut off jurisdictional discovery prematurely.

## IV.  THE PUTATIVE DEFENDANTS' FIRST AMENDMENT RIGHT TO ANONYMITY

Amici contend that the putative defendants' are entitled to First Amendment protection for their "anonymous communication." Amici Mem., at 14.  Amici request, therefore, that the Court consider whether the First Amendment prevents disclosure of the defendants' identifying information and whether the plaintiffs have demonstrated a need to override that protection.[5] Amici's request raises two questions for the Court to evaluate: First, are the putative defendants'

_____

[5] Amici also urge the Court to "set an example of what appropriate procedures must be followed before individuals' identities can be disclosed," including that notice be required to be sent to a customer before identifying information is provided in response to the subpoenas. Amici Mem., *Wild*, ECF No. 18, at 14-19. Such notices are already provided.   Transcript of Mot. Hearing at 51, *Call of the Wild Movie LLC v. Does 1-1,063*, No. 10-cv-455 (Mar. 1, 2011) (plaintiffs' counsel:  "Every single subpoena we sent to an ISP has [Amici's suggested] notice attached to it. And Time Warner, I believe, reached an agreement on the form of that notice . . . and every single subpoena we sent since that date in every new case has that notice.").

BitTorrent activities covered by the First Amendment right to engage in anonymous speech? Second, if the First Amendment protects BitTorrent activity, does the plaintiffs' need for the defendants' identifying information override that protection?

### A. THE DEFENDANTS' RIGHT TO ENGAGE IN ANONYMOUS BITTORRENT ACTIVITY

The First Amendment protects an individual's right to anonymous speech, *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 341-42 (1995) ("The freedom to publish anonymously extends beyond the literary realm"), and this protection extends to anonymous speech on the Internet. *Reno v. ACLU*, 521 U.S. 844, 870 (1997) ("There is 'no basis for qualifying the level of First Amendment scrutiny that should be applied to [the Internet]"); *accord*, *Sinclair v. TubeSockTedD*, 596 F. Supp. 2d 128, 131 (D.D.C. 2009) ("Such rights to speak anonymously apply . . . to speech on the Internet."). Although the right to anonymity is "an important foundation of the right to speak freely," *London-Sire Records*, 542 F. Supp. 2d at 163, the right to free speech is not absolute, and certain classes of speech, such as defamation, libel, and obscenity, for example, are deemed to be beyond the purview of the First Amendment. *See Chaplinsky v. New Hampshire*, 315 U.S. 568, 571 (1942)(". . . the right of free speech is not absolute at all times and under all circumstances. There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which has never been thought to raise any Constitutional problem."); *Beauharnais v. Illinois*, 343 U.S. 250, 266 (1952) (libel); *Miller v. California*, 413 U.S. 15, 23 (1973) (obscenity). Copyright infringement is not protected by the First Amendment. *See Harper & Row Publishers, Inc. v. Nation Enters.,* 471 U.S. 539, 555-57, 560 (1985) (discussing copyright, the fair use doctrine, and the First Amendment). Amici argue, however, that the First Amendment protects "the anonymous publication of expressive works on the Internet even where, as here, the publication is alleged to infringe

copyrights." Amici Mem., at 14. The question for this Court is whether the putative defendants are engaging in any expressive communication when they share files through BitTorrent that is entitled to some First Amendment protection of their anonymity.

While copyright infringement is not afforded First Amendment protection, file-sharing does involve aspects of expressive communication. *See Sony,* 326 F. Supp. 2d at 564 ("the file sharer may be expressing himself or herself through the music selected and made available to others."); *see also London-Sire*, 542 F. Supp. 2d at 163 ("there are some creative aspects of downloading music or making it available to others to copy: the value judgment of what is worthy of being copied; the association of one recording with another by placing them together in the same library; the self-expressive act of identification with a particular recording; the affirmation of joining others listening to the same recording or expressing the same idea . . . . [W]hile the aspect of a file-sharer's act that is infringing is not entitled to First Amendment protection, other aspects of it are."). File-sharers, for example, indicate the artistic works they prefer when they decide to share or download a particular file. This expression can be noticed by other BitTorrent users and can indicate the relative popularity of particular files among a group of individuals.

File-sharers therefore do engage in expressive activity when they interact with other users on BitTorrent. The First Amendment interest implicated by their activity, however, is minimal given that file-sharers' ultimate aim "is not to communicate a thought or convey an idea" but to obtain movies and music for free. [6] *Sony,* 326 F. Supp. 2d at 564. Even if expression were an

---

[6] Amici provide a declaration from Seth Schoen, in which Mr. Schoen states: "BitTorrent provides users with less ability to identify and communicate with the peers with whom they exchange files than other technologies do . . . . There is no easy way for the various BitTorrent users who have uploaded or downloaded parts of a file to recognize, name, or communicate with one another." Amici Reply Brief, Seth Schoen Decl. in Support of Reply Brief ¶9, *Wild*, ECF No. 22. Although this information was supplied to support Amici's contention that the putative defendants are improperly joined, it demonstrates rather that the putative defendants' BitTorrent activities deserve

ancillary aim, the underlying method of the users' communication is illegal. This Court therefore joins a number of other jurisdictions who have deemed that a file sharer's First Amendment right to anonymity is "exceedingly small." *Arista Records LLC v. Does 1-19*, 551 F. Supp. 2d 1, 8 (D.D.C. 2008) ("First Amendment privacy interests are exceedingly small where the 'speech' is the alleged infringement of copyrights."); *see also Achte/Neunte Boll Kino Beteiligungs GMBH & Co, KG v. DOES 1-4,577,* No. 10-453, 2010 U.S. Dist. LEXIS 94594, at *10 n.2 (D.D.C. Sept. 10, 2010) ("the protection afforded to such speech is limited and gives way in the face of a prima facie showing of copyright infringement"); *West Bay One, Inc. v. Does 1-1653*, 270 F.R.D. 13, 16 n.4 (D.D.C. July 2, 2010) (utilizing same language as *Achte/Neunte,* 2010 U.S. Dist. LEXIS 94594, at *10 n.2); *Sony,* 326 F. Supp. 2d at 567 (First Amendment right of alleged file-sharers to remain anonymous "must give way to the plaintiffs' right to use the judicial process to pursue what appear to be meritorious copyright infringement claims."); *Elektra Entm't Group, Inc. v. Does 1-9*, No. 04-2289, 2004 WL 2095581, at *4-5 (S.D.N.Y. Sept. 8, 2004) (finding that First Amendment right to anonymity overridden by plaintiff's right to protect copyright). Nevertheless, file-sharers are engaged in expressive activity, on some level, when they share files on BitTorrent, and their First Amendment rights must be considered before the Court allows the plaintiffs to override the putative defendants' anonymity by compelling the production of these defendants' identifying information. *See Sony,* 326 F. Supp. 2d at 564 ("Although this is not political expression entitled to the broadest protection of the First Amendment, the file sharer's speech is still entitled to some level of First Amendment protection.") (internal quotations omitted).

---

even less First Amendment protection because BitTorrent allows for less communication between users than other file-sharing programs.

21

## B. PLAINTIFFS' NEED TO OVERRIDE FIRST AMENDMENT PROTECTIONS AND IDENTIFY THE PUTATIVE DEFENDANTS

To assess whether the plaintiffs' subpoena should override the putative defendants' First Amendment rights, the Court uses the five-part test originally explicated in *Sony Music Entertainment v. Does 1-40*,[7] 326 F. Supp. 2d at 564-65. This test has been applied by numerous courts across the country and in this district to similar file-sharing copyright infringement actions. *See, e.g., Arista Records*, 551 F. Supp. 2d at 8 (D.D.C. 2008) (Kollar-Kotelly, J.); *Achte/Neunte,* 2010 U.S. Dist. LEXIS 94594, at *10 n.2 (D.D.C. 2010) (Collyer, J.); *West Bay One,* 270 F.R.D. at 16 n.4 (D.D.C. 2010) (Collyer, J.); *London-Sire*, 542 F. Supp. 2d at 164 (D. Mass 2008); *Arista Records, LLC v. v. Doe 3*, 604 F.3d 110 (2d Cir. 2010); *Virgin Records v. Doe*, No. 5:08-cv-389, 2009 U.S. Dist. LEXIS 21701 (E.D N.C. Mar. 16, 2009); *Elektra Entm't Group Inc. v. Does 1-9*, No. 04-cv-2289, 2004 WL 2095581, at *3-4 (S.D.N.Y. Sept. 8 2004). The *Sony* test calls for the court to assess whether the plaintiffs' need for identifying information outweighs the putative defendants' right to First Amendment anonymity by balancing: (1) the

---

[7] Amici urge the Court to adopt a more rigorous five-part balancing test that was originally set forth in *Dendrite International v. Doe*, a New Jersey state case that required: "(1) that the plaintiff undertake to notify the anonymous posters that they are the subject of a subpoena seeking their identity; (2) that the plaintiff specify the exact statement alleged to constitute actionable speech; (3) that the court review the complaint and other information to determine whether a viable claim against the anonymous defendants is presented; (4) that the plaintiff produce sufficient evidence to support, prima facie, each element of its cause of action; and (5) that the court then balance the First Amendment right of anonymous speech against the strength of the plaintiff's prima facie claim and the need for disclosure of the anonymous defendant's identity." *Dendrite Int'l v. Doe*, 775 A.2d 756, 760-61 (N.J. Super. Ct. App. Div. 2001); *see also Sinclair v. TubeSockTedD*, 596 F. Supp. 2d 128 (D.D.C. 2009) (discussing, but not adopting the *Dendrite* test) (Bates, J.). The *Dendrite* test was applied in a defamation case; the case that discusses the *Dendrite* test in this district was also a defamation action. *Sinclair*, 596 F. Supp. 2d 128 (defamation action in which plaintiff sought identifying information for three anonymous online posters). This test has generally not been adopted in file-sharing cases. *See*, *e.g., London-Sire*, 542 F. Supp. 2d at 164 n.2 ("*Dendrite*, like many other cases involving internet speech, is not directly applicable to [file-sharing cases]. In that case, the plaintiff asserted that the anonymous defendant had defamed it on an internet bulletin board-an act much more clearly in the wheelhouse of the First Amendment's protections."); *Sony BMG Music Entm't v. Doe*, No. 5:08-109, 2009 WL 5252606, at *7 n.14 (E.D.N.C. Oct. 21, 2009)(" The protected speech at issue in *Dendrite* was allegedly defamatory comments posted on an internet bulletin, not the less expressive act of distributing music over the internet. In addition, the claim in *Dendrite* was for defamation, not copyright infringement, a unique area of particular federal concern."). The First Amendment interests implicated in defamation actions, where expressive communication is the key issue, is considerably greater than in file-sharing cases. The Court therefore believes that the *Sony* test is more applicable to the present case.

22

concreteness of the plaintiffs' showing of a prima facie claim of actionable harm; (2) the specificity of the plaintiffs' discovery request; (3) alternative means to get the information the plaintiffs seek; (4) the need for the information to advance the plaintiffs' claim; and (5) the objecting party's expectation of privacy. *Sony,* 326 F. Supp. 2d at 564-65.

### 1. *Plaintiffs' Showing of a Prima Facie Claim*

The first factor of the *Sony* analysis seeks to protect against gratuitous disclosure of identifying information when an individual's First Amendment anonymity rights are implicated. As one court noted, "people who have committed no wrong should be able to participate online without fear that someone who wishes to harass or embarrass them can file a frivolous lawsuit and thereby gain the power of the court's order to discover their identity." *Columbia Ins. Co. v. Seescandy.com,* 185 F.R.D. 573, 578 (N.D. Cal. 1999) (pre-dating the *Sony* test, but recognizing the difficulty facing courts when confronted with civil subpoenas seeking disclosure of identifying information for anonymous Internet users). To this end, courts must ensure that plaintiffs have made a "concrete" showing of a prima facie claim. *Sony*, 326 F. Supp. 2d at 565. For the plaintiffs to establish a prima facie claim of copyright infringement, they must demonstrate: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original. *Feist Pub'ns, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 361 (1991).

Plaintiffs have adequately demonstrated a prima facie claim of copyright infringement against the putative defendants. First, the plaintiffs allege that they are "holder[s] of the pertinent exclusive rights infringed by Defendants" and cite to certificates of copyrights issued by the Registrar of Copyrights. Amended Compl., *Wild*, ¶ 10; *see also* Amended Compl. *Maverick*, ¶ 9; Compl., *Donkeyball*, No. 10-1520, ¶ 10. The plaintiffs further assert that the putative defendants violated the plaintiffs' exclusive rights of reproduction and distribution when

23

they, "without the permission or consent of Plaintiff[s], distributed the Copyrighted Motion Picture[s] to the public, including by making available for distribution to others." *Id.* at ¶ 12. The plaintiffs support these allegations by supplying the date and time that the alleged infringement occurred, along with affidavits from Messrs. Benjamin Perino and Patrick Achache describing the process by which the defendants' infringement was observed, recorded, and verified.[8]  Pl.'s Mot. for Leave to Take Disc. Prior to Rule 26(f) Conference, *Wild*, ECF No. 2, Benjamin Perino Decl., Patrick Achache Decl.;  Pl.'s Mot. for Leave to Take Disc. Prior to Rule 26(f) Conference, *Maverick*, ECF Nos. 4-6, Benjamin Perino Decl., Patrick Achache Decl.; Pl.'s Mot. for Leave to Take Disc. Prior to Rule 26(f) Conference, *Donkeyball*, ECF No. 4, Benjamin Perino Decl., Patrick Achache Decl.  Accordingly, the plaintiffs have appropriately pled a prima facie claim of copyright infringement against the putative defendants.

### 2. The Specificity of the Plaintiffs' Discovery Requests

The second *Sony* factor weighs the specificity of the plaintiffs' requests for identifying information.  This factor is intended to keep the plaintiffs' request narrow so as to prevent overbroad discovery requests that "unreasonably invade[] the anonymity of users who are not alleged to have infringed . . . ." *London-Sires,* 542 F. Supp. 2d. at 178.  In *Wild, Maverick*, and *Donkeyball*, the Court granted the plaintiffs leave to subpoena ISPs for the putative defendants' name, current and permanent address, telephone number, e-mail address, and Media Access

---

[8] During oral argument, Amici noted that the declarations of Messrs. Perino and Achache submitted by plaintiffs in support of their motions for leave to take expedited discovery in *Wild* and *Maverick* are dated December 31, 2009, even though a number of the putative defendants are alleged to have engaged in infringing activity after that date. Transcript of Mot. Hearing, at 46-47, Call of the Wild Movie LLC v. Does 1-1,063, No. 10-cv-455 (Mar. 1, 2011); *see also* Pl.'s Mot. Leave to Take Expedited Disc., *Maverick*, ECF No. 4, Benjamin Perino Decl., ¶ 11; Pl.'s Mot. Leave to Take Expedited Disc., *Donkeyball*, ECF No. 4, Benjamin Perino Decl., ¶ 11.  These declarations only purport to describe the procedures used to identify those accused of illegally distributing plaintiffs' motion pictures and, thus, the date of that description does not undercut the claims against the putative defendants, as Amici appear to imply.

24

Control address.  Order Granting Pl.'s Mot. Expedited Discovery, at 2, *Wild*, Apr. 15, 2010, ECF No. 4; Order Granting Pl. Mot. Expedited Discovery, *Maverick*, May, 24 2010, ECF No. 7,; Order Granting Expedited Discovery, *Donkeyball*, Oct. 19, 2010, ECF No. 6.  This information will enable the plaintiffs to properly name and serve the putative defendants.  By court order, this information "may be used by the plaintiff solely for the purpose of protecting the plaintiff's rights as set forth in the complaint." *Id.*  These limited discovery requests, along with the restrictions imposed by the Court, are specifically targeted to obtain the information plaintiffs need to prosecute their lawsuits.

### 3. No Alternate Means to Obtain the Information

The third *Sony* factor inquires whether the plaintiffs have any other means to obtain the defendants' identifying information other than compelling the information from ISPs.  The plaintiffs state that without expedited discovery the "Plaintiff[s] ha[ve] no way of serving Defendants with the complaint and summons in this case.  Plaintiff[s] do[] not have Defendants' names, addresses, e-mail addresses, or any other way to identify or locate Defendants, other than the unique IP address assigned to each Defendant by his/her ISP on the date and at the time of the Defendant's infringing activity." Pl.'s Mot. for Leave to Take Disc. Prior to Rule 26(f) Conference, *Wild*, ECF No. 2, Benjamin Perino Decl., ¶ 11.  Amici and Time Warner do not dispute that the plaintiffs have no other sources for the information they seek.

### 4. Plaintiffs' Need for the Information

The plaintiffs have sufficiently alleged prima facie claims of copyright infringement against the putative defendants, and have also demonstrated that there are no alternate means to obtain the defendants' identifying information.  Without this information from the ISPs, the plaintiffs cannot name and serve those whom they allege to have infringed upon their copyrights.

Pl.'s Mot. for Leave to Take Disc. Prior to Rule 26(f) Conference, *Wild,* ECF No. 2, Benjamin Perino Decl., ¶ 11.  ("Without expedited discovery . . . Plaintiff[s] [have] no way of serving Defendants with the complaint and summons in this case.").  The putative defendants' identifying information is therefore critical to the plaintiffs' cases.

*5. The Putative Defendants' Expectation of Privacy*

As previously discussed, the putative defendants have minimal First Amendment protection against disclosure of their identities in the face of the plaintiffs' allegations that they infringed the plaintiffs' copyrights.  Their expectation of privacy is similarly minimal in this context.

This conclusion is underscored by Time Warner's Terms of Service, which specifically warns customers against engaging in illegal infringing activity, with the penalty of termination or suspension of service:

> "Time Warner Cable's subscribers and account holders may not upload, post, transmit or otherwise make available on or via the Road Runner Service any material protected by copyright in a manner that infringes that copyright. In accord with the Digital Millennium Copyright Act, it is the policy of Time Warner Cable to terminate in appropriate circumstances the Road Runner Service of any subscriber or account holder who is a repeat infringer. . . . Time Warner Cable expressly reserves the right to terminate or suspend the service of any subscriber or account holder even for a single act of infringement."

Time Warner's Reply to Pl.'s Opposition to Time Warner's Mot. Quash, *Donkeyball*, ECF No. 16, at 8 n.2.

Further, available on Time Warner's website is the Time Warner Cable Subscriber Privacy Notice, which is provided to users "upon initiation of service and annually thereafter." TIME WARNER CABLE SUBSCRIBER PRIVACY NOTICE (July 2010), *available at http://help.tw cable.com/html/twc_privacy_notice.html.* This notice informs customers that Federal law requires Time Warner to "disclose personally identifiable information to a governmental entity

26

or other third parties pursuant to certain legal process . . . [Time Warner] will comply with legal process when we believe in our discretion that we are required to do so. We will also disclose any information in our possession to protect our rights, property and/or operations, or where circumstances suggest that individual or public safety is in peril." *Id.*

Time Warner informed its customers that it was monitoring for instances of copyright infringement, and if a customer did engage in such conduct, Time Warner would likely terminate or suspend the customer's service. Time Warner's privacy notice also explicitly informs customers that their information could be disclosed upon court order. Thus, under these circumstances, the putative defendants have little to no expectation of privacy while engaging in allegedly infringing activities about which they are warned against. *See generally Sony*, 326 F. Supp. 2d at 566-67 (minimal expectation of privacy when ISP's terms of service prohibit copyright infringement and state that information can be relayed to law enforcement).

## C. DEFENDANTS' FIRST AMENDMENT RIGHTS DO NOT PREVENT DISCLOSURE OF IDENTIFYING INFORMATION

Upon balancing the putative defendants' First Amendment rights to anonymity and the plaintiffs' need for the identifying information, the Court finds that the plaintiffs' need overrides the putative defendants' right to use BitTorrent anonymously. The putative defendants' asserted First Amendment right to anonymity in this context does not shield them from allegations of copyright infringement. The plaintiffs therefore may obtain from ISPs information identifying the putative defendants.

## V. TIME WARNER'S MOTION TO QUASH

Having considered the arguments put forth by Amici in support of Time Warner's Motion to Quash, the Court turns to Time Warner's own arguments to quash the plaintiffs'

subpoenas pursuant to Federal Rule of Civil Procedure 45(c). Time Warner argues that producing the requested information would subject it to an undue burden and, if the subpoenas are not quashed, seeks to modify the subpoenas to limit Time Warner's compliance to production of identifying information for 28 IP addresses per month.[9] For the reasons discussed below, Time Warner has failed to demonstrate that the burdens associated with producing the requested information justify quashing the plaintiffs' subpoenas or limiting Time Warner's production obligations.

## A. LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 45, the Court must quash a subpoena issued to a nonparty if the subpoena subjects the nonparty to an undue burden or expense. FED. R. CIV. P. 45(c). The nonparty seeking relief from subpoena compliance bears the burden of demonstrating that a subpoena should be modified or quashed. *See Linder v. Dep't of Defense*, 133 F. 3d 17, 24 (D.C. Cir. 1998); *In re Micron Technology Inc. Securities Lit.*, 264 F.R.D. 7, 9 (D.D.C. 2010); *Achte/Neunte*, 736 F. Supp. 2d 212, 215 (D.D.C. 2010).

Quashing subpoenas "goes against courts' general preference for a broad scope of discovery, [but] limiting discovery is appropriate when the burden of providing the documents outweighs the need for it." *North Carolina Right to Life, Inc. v. Leake*, 231 F.R.D. 49, 51 (D.D.C. 2005) (internal citations omitted). When evaluating whether the burden of subpoena compliance is "undue," the court balances the burden imposed on the party subject to the subpoena by the discovery request, the relevance of the information sought to the claims or

---

[9] Time Warner notes that another judge in this district also denied Time Warner's motions to quash in two file-sharing cases, but granted a protective order limiting Time Warner's subpoena production obligations in those cases to only 28 IP addresses a month. *See Achte/Neunte Boll Kino Beteiligungs GMBH & Co, KG v. Does 1 - 4,577*, No. 10-cv-00453, ECF No. 33 (D.D.C. July 2, 2010) (Collyer, J.); West *Bay One, Inc. v. Does 1-1653*, No. 10-cv-00481, ECF No. 24 (D.D.C. July 2, 2010) (Collyer, J.). This Court is not bound by findings in other cases and, in any event, this Court evaluated information not directly considered by the other court, including Time Warner's efforts to preserve the requested information, and supplemental affidavits from plaintiffs, Time Warner, and Amici.

defenses at issue, the breadth of the discovery request, and the litigant's need for the information. *See id.* at 51; *Linder,* 133 F.3d at 24 ("Whether a burdensome subpoena is reasonable must be determined according to the facts of the case, such as the party's need for the documents and the nature and importance of the litigation.") (internal quotations omitted); *Achte/Neunte*, 736 F. Supp. 2d at 214. The court must limit discovery when the "burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues." FED. R. CIV. P. 26(b)(2)(C)(iii). The 'undue burden' test also requires the court to be "generally sensitive to the costs imposed on third-parties." *In re Micron Tech.,* 264 F.R.D. at 9.

## B. EVALUATING TIME WARNER'S BURDEN

At the outset, Time Warner does not dispute that the identifying information sought by the subpoenas is critical to the plaintiffs' lawsuits since without production of this information, the plaintiffs are unable to name and serve the putative defendants. In addition, Time Warner does not claim that the subpoenas seek any more information than the Court authorized: namely, "information sufficient to identify each defendant, including his or her name, current and permanent address(es), telephone number(s), e-mail address(es), and Media Access Control address(es)." Order Granting Expedited Disc., *Wild*, ECF No. 4, Apr. 15, 2010; Order Granting Expedited Disc., *Maverick*, ECF No. 7, May, 24 2010; Order Granting Expedited Disc., *Donkeyball*, ECF No. 6, Oct. 19, 2010. Thus, the plaintiffs' requests are not unspecific, undefined or unduly broad. *Cf. North Carolina Right to Life*, 231 F.R.D. at 52 (quashing subpoena in part because discovery request sought "vast array of documents arising from 'contacts'" between parties).

Nevertheless, Time Warner characterizes plaintiffs' discovery demands as "overbroad." Time Warner Mem. Supp. Mot. Quash, *Wild*, at 12. The respective plaintiffs in these three cases subpoenaed Time Warner for information relating to a total of 1,028 IP addresses. Time Warner Mot. Quash, *Wild*, ECF No. 7, Ex. 1 (224 IP addresses); Time Warner Mot. Quash, *Maverick*, ECF No. 18, Ex. 1 (783 IP addresses); Time Warner Mot. Quash, *Donkeyball*, ECF No. 7, Ex. 1 (21 IP addresses). The overbreadth that Time Warner complains of is due to the large number of Time Warner's customers allegedly engaging in infringing activities and prompting the plaintiffs' need for their identifying information. This, however, does not render the subpoenas overbroad in terms of the information requested about each defendant.

Thus, Time Warner's principle contention is that, due to the large number of its customers allegedly engaging in online infringing activities, it would "suffer significant harms" and "incur significant costs" because compliance with requests for identifying information about those customers would "overwhelm" its capacity and "completely absorb the resources for many months." Time Warner Mot. Quash, *Donkeyball*, ECF No. 7, Ex. 2, Craig Goldberg Aff. dated Dec. 10, 2010, ¶¶ 9,12; *see also* Time Warner Mot. Quash, *Maverick*, ECF No. 18, Craig Goldberg Aff. dated Nov. 22, 2010, ¶¶ 9,12; Time Warner Mot. Quash, *Wild*, ECF No. 7, Craig Goldberg Aff. dated May 10, 2010, ¶¶ 7, 9. To support its motions, Time Warner initially submitted a single four-page affidavit by Craig Goldberg, Assistant Chief Counsel, Litigation and Time Warner's Chief Privacy Officer, in all three cases. This affidavit provided general and conclusory information about the Time Warner subpoena compliance process. Following oral argument on Time Warner's motions to quash, the company supplemented the record with an

additional affidavit.[10] Notwithstanding the supplemental affidavit, Time Warner has failed to demonstrate that complying with the plaintiffs' subpoenas would subject it to an undue burden.

Time Warner describes its subpoena compliance operations as follows: Within its legal department, Time Warner has a "subpoena compliance team" comprised of five full-time employees and one temporary employee who focus "exclusively" on responding to subpoena requests, court orders, and National Security Letters. Time Warner Mot. Quash, *Donkeyball*, ECF No. 7, Goldberg Aff. dated Dec. 10, 2010, at ¶ 3; *see also* Time Warner Mot. Quash, *Maverick*, ECF No. 18, Craig Goldberg Aff. dated Nov. 22, 2010; Time Warner Mot. Quash, *Wild*, ECF No. 7, Craig Goldberg Aff. dated May 10, 2010. In both its unsealed and sealed affidavits, Time Warner indicates that it received approximately 567 IP lookup requests a month, mostly from law enforcement, but does not specify over what period of time this was the average number.[11] *Id.* at ¶ 6. In both affidavits Time Warner also contends that it cannot divert any more resources toward responding to subpoena requests "without harming its efforts to assist law enforcement and overburdening [Time Warner's] subpoena response team." *Id.* at ¶ 8. Time Warner complains that, from February to December 2010, Time Warner "received over two

_____

[10] Time Warner moved for, and the Court granted, leave to file a supplemental affidavit under seal because Time Warner represented that the supplemental affidavit relayed "highly proprietary" and "competitively sensitive information the disclosure of which could harm TWC's business interests," and prejudice both TWC and law enforcement. Time Warner's Mot. for Leave to File Affidavit Under Seal, *Wild*, ECF No. 38, March 17, 2011; Minute Order, *Wild*, March 22, 2011 (granting leave to file affidavit under seal); Time Warner's Mot. for Leave to File Affidavit Under Seal, *Maverick*, ECF No. 45, March 17, 2011; Minute Order, *Maverick*, March 17, 2011 (granting leave to file affidavit under seal); Time Warner's Mot. for Leave to File Affidavit Under Seal, *Donkeyball*, ECF No. 23, March 17, 2011; Minute Order, *Donkeyball*, March 17, 2011 (granting leave to file affidavit under seal). The sealed, supplemental affidavit contains certain information already provided to the Court in the initial, public affidavit, and the Court is hard-pressed to understand why the names of commercially available software and hardware equipment and tools used by Time Warner warrant sealing. Therefore, the Court will order Time Warner to review the sealed, supplemental affidavit and to file publicly a version from which Time Warner has redacted only the information that reflects clearly proprietary and security sensitive information. For each item redacted, Time Warner is required to provide the Court with an explanation specifying what makes the redacted information "proprietary" or "security sensitive."

[11] Time Warner states this was the average number of IP lookup requests "[p]rior to requests associated with file-sharing litigation." Without more specific information about the time period, it is unclear whether that was the average number over the past year, the past five years, or some other time period.

dozen subpoenas" for 4,100 IP lookups in file-sharing cases from "private litigants," *id.* at ¶ 7, but provides no information about how many of these subpoenas originated from the plaintiffs or plaintiffs' counsel.

Time Warner states that producing the information requested by the plaintiffs is a "multi-step process" that "requires both centralized efforts at [Time Warner]'s corporate offices, as well as efforts at the local operations center where the relevant subscriber is located." *Id. at* ¶ 5. This "multi-step process" is not unusual. Most consumer IP addresses are 'dynamic' as opposed to 'static.' *See generally London-Sires*, 542 F. Supp. 2d at 160. Static IP addresses are addresses which remain set for a specific user. *Id.* Dynamic IP addresses are randomly assigned to internet users and change frequently. *Id.* Consequently, for dynamic IP addresses, a single IP address may be re-assigned to many different computers in a short period of time. *Id.* Associating a dynamic IP address with a particular customer at a given moment makes the task of "discovering the identity of a particular infringer more difficult." *Id.*; *see also U.S. v. Steiger*, 318 F.3d 1039, 1042 (11th Cir. 2003)("Static addresses are undoubtedly easier to trace, but ISPs generally log the assignments of their dynamic addresses."). This requires ISPs to maintain logs and other records, and to use commercially available or customized software tools, to correlate the IP address assigned to a computer at a specific moment with the subscriber's account information in order to identify a customer from the IP address, either for the ISPs own internal business purposes or to respond to subpoenas requesting identifying information about a customer. *See, e.g., Klimas v. Comcast Cable Commc'n, Inc.*, 465 F.3d 271, 275 (6th Cir. 2006)("dynamic IP addresses constantly change and unless an IP address is correlated to some other information, such as Comcast's log of IP addresses assigned to its subscribers…, it does not identify any single subscriber by itself.")(internal quotations omitted);

Time Warner describes the process as "time consuming and can require the work of multiple people at multiple locations." Time Warner Mot. Quash, *Donkeyball*, ECF No. 7, Ex. 2, Craig Goldberg Aff. at ¶5. This information, even when supplemented by Time Warner's sealed affidavit, does not support Time Warner's contention that compliance with the plaintiffs' subpoenas in *Wild, Maverick*, and *Donkeyball* subject it to an undue burden. Time Warner concedes that in order to pursue its motions to quash it has already taken steps to isolate and preserve the information necessary to provide customer identifying information for the requested IP addresses. *See* Transcript of Mot. Hearing at 9, *Call of the Wild Movie LLC v. Does 1-1,063*, No. 10-cv-455 (Mar. 1, 2011) (Time Warner's counsel states that its client has "incurred a substantial burden already" by preserving the data.). It has been eleven months since Time Warner was issued a subpoena in *Wild*, six months since the subpoena in *Maverick* was issued, and four months since the subpoena in *Donkeyball* was issued. Time Warner's Mot. Quash, *Wild*, ECF No. 7, Ex. 1, Subpoena dated April 30, 2010; Time Warner's Mot. Quash, *Maverick*, ECF No. 18, Ex. 1, Subpoena dated Sept. 14, 2010; Time Warner's Mot. Quash, *Donkeyball*, ECF No. 7, Ex. 1, Subpoena dated Nov. 11, 2010. In this timeframe, Time Warner accomplished "fifty-percent or more" of the work necessary to respond to the subpoenas by isolating and preserving the data. Transcript of Mot. Hearing, at 12, *Call of the Wild Movie LLC v. Does 1-1,063*, No. 10-cv-455 (Mar. 1, 2011) (Time Warner's counsel stating that "something on the order of, you know, 50 percent or more [of the work] may have already been done"). If it took less than one year to complete fifty percent of the work, it is difficult to see why it will take over three more years, at 28 IP address lookups per month, to complete the production.

Time Warner's contention that it can only produce 28 IP addresses per month seems extraordinarily dilatory compared to the rate at which other ISPs are able to produce the

requested information. *See* Supplemental Declaration of Nicholas Kurtz, *Maverick*, ECF No. 42, ¶ 6 (relaying that in *Achte,* No. 10-cv-453 (D.D.C.) (Collyer, J.) and *West Bay One*, No. 10-cv-481 (D.D.C.) (Collyer, J.) Comcast averaged 141 IP lookups a month, Charter averaged 199 IP lookups a month, Cox averaged 113.43 IP lookups a month, and Verizon averaged 294.5 IP lookups a month). Time Warner's description of its "multi-step" process indicates that, in addition to the five-person subpoena compliance team, employees in its regional offices are able to assist in the process of identifying the customers associated with particular IP addresses. This suggests that when confronted with a large volume of subpoenas for identifying information about its customers that may strain its subpoena compliance team, Time Warner has additional resources already on staff in regional offices to address the production.

In addition, as part of the effort to resolve this discovery dispute without judicial intervention, the plaintiffs' counsel offered to pay Time Warner to employ another temporary worker to help respond to the plaintiffs' subpoena requests. Transcript of Mot. Hearing at 64, Call of the Wild Movie LLC v. Does 1-1,063, No. 10-cv-455 (Mar. 1, 2011) (plaintiffs' counsel states: "As a quick aside, in prior negotiations, we have offered to basically pay for a temporary employee. We have paid for the production, even though I argue -- and I think it is legitimate -- that we arguably don't have to pay for these productions because it is already part of their business."). Time Warner already employs a temporary worker to handle the volume of subpoena requests it must process as part of its business operations. Thus, while the company is under no obligation to accept this offer to defray costs, use of another temporary worker is not an extraordinary or unusual solution but instead consistent with its normal business practice to facilitate timely compliance with subpoenas.

Time Warner included with its general description of the subpoena compliance process a summary statement that the cost of producing identifying information for one IP address is $45. Time Warner Mot. Quash, *Donkeyball*, ECF No. 7, Ex. 2, Craig Goldberg Aff. at ¶ 11. The study underlying this cost estimate contains no detail about the process used for subpoena compliance, but only general numbers regarding total employee compensation and alleged time spent responding to IP lookup requests. Pl.'s Opposition Time Warner's Mot. Quash, *Wild*, ECF. No. 9, Ex. 2. Based on this estimate, the total cost to produce information in *Wild* would be "approximately $10,080," Time Warner Mem. Supp. Mot. Quash, *Wild,* ECF No. 7, at 9, and in *Maverick* and *Donkeyball* approximately "$36,180 (804 IP x $45 IP addresses), plus the costs of notifying each subscriber." Time Warner Mem. Supp. Mot. Quash, *Donkeyball,* ECF No. 7, at 9-10.

When granting the plaintiffs leave to subpoena ISPs, the Court allowed the ISPs to charge the plaintiffs for the costs of producing the requested information. Order Granting Pl.'s Mot. for Expedited Discovery, *Wild*, ECF No. 4, April 15, 2010, at 3-4 ("ORDERED that any ISP that receives a subpoena and elects to charge for the costs of production shall provide a billing summary and any cost reports that serve as a basis for such billing summary and any costs claimed by such ISP . . ."); Order Granting Pl.'s Mot. for Expedited Discovery, *Maverick*, ECF No. 7, May 24, 2010, at 3 ("ORDERED that any ISP which receives a subpoena and elects to charge for the costs of production shall provide a billing summary and any cost reports that serve as a basis for such billing summary and any costs claimed by such ISP. . .) ; *See also* Order Granting Pl.'s Mot. for Expedited Discovery, *Donkeyball*, ECF No. 6, Oct. 19, 2010 (not specifically mentioning billing provision, but see Pl.'s Mot. for Expedited Discovery, *Donkeyball*, ECF No. 4, Ex. 3, Text of Proposed Order, at 2). In so far as Time Warner argues

35

that cost alone serves as a basis to quash plaintiffs' subpoenas, that position is unavailing since the plaintiffs will cover the cost, per the court order.

Time Warner has failed to demonstrate that compliance with the plaintiffs' subpoena requests would impose an undue burden. Although Time Warner asserts that producing the requested information is a "multi-step process," it admits that "more than fifty percent" of the work has already been done, with the identifying information subject to the subpoena isolated and preserved. The Court sees no reason why Time Warner cannot expeditiously complete the processing of this information for production to the plaintiffs.

Time Warner's motions to quash in *Wild, Maverick*, and *Donkeyball* on the basis that the subpoenas are unduly burdensome are therefore denied.

### C. TIME WARNER'S ALTERNATE ARGUMENTS TO QUASH PLAINTIFFS' SUBPOENAS

In *Wild* and *Maverick*, Time Warner proffers additional arguments to quash the plaintiffs' subpoenas. In *Wild*, Time Warner (1) asserts that plaintiffs' counsel breached an agreement that limited subpoena requests to 28 IP addresses a month, and (2) requests the Court to alter the parties' costs arrangement so as to order the plaintiff to pay Time Warner in advance of producing the requested information. Time Warner Mem. Supp. Mot. Quash, *Wild*, ECF No. 7, at 8, 11-12. In *Maverick*, Time Warner contends that the plaintiff did not properly serve Time Warner with its subpoena. Time Warner Mem. Supp. Mot. Quash, *Maverick*, ECF No. 18, at 15-17.

Time Warner has failed to demonstrate that the plaintiffs' subpoenas should be quashed in *Wild*. In *Wild,* there was no meeting of the minds between plaintiffs' counsel and Time Warner; and the Court additionally declines to alter the cost arrangement previously ordered by the Court. In *Maverick,* however, the plaintiff did not abide by the Federal Rules of Civil

Procedure when serving its subpoena. Time Warner's Motion to Quash in *Maverick* is therefore granted.

### 1. Purported Agreement to Limit Production in Wild

The Court first dispenses with Time Warner's argument that the Court should quash the plaintiff's subpoena in *Wild* because of a purported agreement with plaintiff's counsel to limit Time Warner's subpoena production to 28 IP addresses a month. In the District of Columbia, a valid contract requires "both (1) agreement as to all material terms; and (2) intention of the parties to be bound." *T Street Development, LLC v. Dereje and Dereje*, 586 F.3d 6, 11 (D.C. Cir. 2009). The Court primarily looks to intent of the parties entering into the agreement. *Christacos v. Blackie's House of Beef, Inc.*, 583 A.2d 191, 194 (D.C. 1990). Intent is an objective inquiry that the Court assesses by asking "what a reasonable person in the position of the parties would have thought the disputed language meant." *Id.* (quoting *1010 Potomac Assocs. v. Grocery Mfrs. of Am., Inc.,* 485 A.2d 199, 205 (D.C.1984)). The burden of proof that a contract exists falls on the party attempting to enforce the agreement. *See Novecon Ltd. v. Bulgarian-American Enterp. Fund*, 190 F.3d 556 (D.C. Cir. 1999).

Time Warner argues that it reached a "negotiated agreement" with plaintiffs' counsel that Time Warner would provide the plaintiff with information for 28 IP addresses a month "with the specific acknowledgement that it applied to all future subpoenas that [plaintiffs' counsel] served on [Time Warner]." Time Warner Mem. Supp. Mot. Quash, *Wild*, at 8. This agreement was not memorialized in a signed document, but rather, according to Time Warner, was negotiated and agreed to in string of emails dated March 19, 2010 discussing subpoena production in other file-sharing cases. Time Warner's Mot. Quash, *Wild*, ECF No. 7, Ex. 3. The Court has reviewed the emails cited by Time Warner and finds that there was no meeting of the minds and no evidence

37

that plaintiff's counsel agreed to limit Time Warner's obligations under the subpoenas to production of 28 IP addresses a month for all his clients, present and future. On the contrary, the last email sent by plaintiff's counsel Thomas Dunlap makes clear that he anticipated additional requests for IP lookups. *Id.*, Ex. 3 (email from Thomas M. Dunlap to Craig Goldberg Re: Subpoenas to TWC, dated March 19, 2010, 3:47 PM states: "[w]e may need to request more subpoenas, however we will discuss this with you before we send it over so we can work out a timetable and method.") Time Warner's contention that a prior agreement limits Time Warner's subpoena compliance obligations in *Wild* is therefore unsuccessful.

### 2. Cost-Shifting in Wild

In *Wild,* Time Warner requests that the Court alter the cost arrangement set forth in the Court's April 15, 2010 order, in which the Court granted the plaintiff leave to subpoena ISPs for identifying information regarding the putative defendants. Order Granting the Plaintiff's Mot. for Expedited Discovery, *Wild*, ECF No. 4. In that Order, the Court specifically stated that:

> "**. . .** any ISP that receives a subpoena pursuant to this Memorandum Order shall *not assess any charge to the plaintiff before providing the information* requested in the Rule 45 subpoena, nor shall the ISP assess a charge to the plaintiff in connection with IP addresses that are not controlled by that ISP, *duplicate IP addresses that resolve to the same individual*, other IP addresses that do not provide the name and other information requested of a unique individual or for the ISP's internal costs incurred to notify the ISP's customers; and it is
>
> **ORDERED** that any ISP that receives a subpoena and elects to charge for the costs of production shall provide a billing summary and any cost reports that serve as a basis for such billing summary and any costs claimed by such ISP . . ."

*Id.* at 3-4 (emphasis supplied). Time Warner now requests that the Court alter that arrangement so that Time Warner is paid in advance of providing the requested information to the plaintiff, and is paid "on a per-IP-address basis, rather than per subscriber." Time Warner Mem. Supp. Mot. Quash, *Wild*, at 11-12. Time Warner has proffered no complaints about plaintiffs' inability

or refusal to pay for subpoena compliance that would justify alteration of the order to a pre-payment plan. Nor does Time Warner contend that it is under such a financial hardship that pre-payment is required.

No other ISP subpoenaed by the plaintiff in *Wild* has come forward requesting that the order to be modified on grounds that this cost arrangement is unfair and the Court declines to make an exception for Time Warner, particularly given the paucity of the reasons proffered for the requested changes.

*3. Improper Service of the Plaintiff's Subpoena in Maverick*

As an alternate basis to quash the plaintiff's subpoena in *Maverick*, Time Warner asserts that the plaintiff did not serve its subpoena in accordance with Rule 45(b) of the Federal Rules of Civil Procedure. Specifically, Time Warner asserts that the plaintiff faxed and emailed Time Warner the *Maverick* subpoena, but never delivered the subpoena to a named person.

Under Federal Rule of Civil Procedure 45(b), "serving a subpoena requires delivering a copy to the named person." The "longstanding interpretation of Rule 45 has been that personal service of subpoenas is required. The use of the word "delivering" in subdivision (b)(1) of the rule with reference to the person to be served has been construed literally." 9A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2454 (2010). A minority of courts have broadened the interpretation of Rule 45(b) and held that personal in-hand service is not required. *See, e.g., Hall v. Sullivan*, 229 F.R.D. 501, 506 (D. Md. 2005) ("no reason to require in-hand delivery of subpoenas [*duces tecum*]-so long as the service is in a manner that reasonably ensures actual receipt of the subpoena by the witness."). Courts in this jurisdiction have not followed this path. *See, e.g., U.S. v. Philip Morris Inc.*, 312 F. Supp. 2d 27, 36-37 (D.D.C. 2004) (stating that "FED. R. CIV. P. 45(b) (1) requires personal service of deposition

39

subpoenas" and quashing subpoenas left in the party's mail room); *Alexander v. F.B.I.*, 186 F.R.D. 128, 130 (D.D.C. 1998) (stating that it is "well settled that, under FED. R. CIV. P. 45(b), [the non-party's] deposition subpoena must have been personally served upon him").

It is undisputed that in *Maverick* plaintiff's counsel forwarded the subpoena as an attachment to an email to Time Warner's counsel on September 14, 2010. Pl.'s Opp'n To Time Warner Mot. Quash, ECF No. 22, Ex. 1 (email from Nicholas Kurtz to Alexander Maltas dated Sept. 14, 2010, 3:53 PM). In the text of the email, plaintiff's counsel asked Time Warner's counsel to accept service by email of the plaintiff's subpoena. *Id*. The following day, Time Warner's counsel responded via email that he was not authorized to accept such service. Time Warner's Mot. Quash, *Maverick*, ECF No. 18, Ex. 5 (Letter from Alexander Maltas to Thomas Dunlap and Nicholas Kurtz dated October 13, 2010). Despite this disavowal of service, a week later, on September 22, 2010, a Time Warner representative named "Tammi" called plaintiff's counsel and told him that she would be working on the subpoena and requested that he email a copy to her. Pl.'s Opp'n Time Warner's Mot. Quash, *Maverick,* ECF No. 22, Nicholas Kurtz Decl., ¶ 4 and Ex. 2 (Kurtz email to 'subpoena.compliance@twccable.com' dated Sept. 22, 2010: "Pursuant to my telephone conversation with Tammi, attached is the Excel spreadsheet for the Maverick civil subpoena. I have also attached a PDF of the subpoena for your convenience."). On October 13, 2010, Time Warner sent the plaintiff a letter stating that Time Warner had yet to be properly served with plaintiff's subpoena in *Maverick*. Time Warner's Mot. Quash, *Maverick*, ECF No. 18, Ex. 5 (Letter from Alexander Maltas to Thomas Dunlap and Nicholas Kurtz, dated October 13, 2010). Nevertheless, the plaintiff did not take steps to deliver the subpoena personally and relied solely upon service by fax and email.[12]

---

[12] Plaintiff argues that Time Warner's "own subpoena compliance website states that [Time Warner] 'accepts lawful process by fax.'" Pl.'s Mem. Opp'n Time Warner's Mot. Quash, *Maverick*, ECF No. 22, at 16; Kurtz Decl., Ex. 6

The Federal Rules of Civil Procedure requires personal service of subpoenas. *See* FED. R. CIV. P. 45(b) (1). The Court acknowledges that strict adherence to the literal interpretation of Rule 45(b)(1) may place form over substance, particularly when, as here, the subpoenaed party acknowledges that it received the subpoena at issue and has a history of multiple contacts over subpoena compliance with the sender of the subpoena. At the same time, however, the plaintiff is required to comply with Rule 45(b) (1).

In a last gasp effort to avoid the quashing of the subpoena in *Maverick*, plaintiff's counsel argues -- without citation to any legal authority for this waiver argument -- that Time Warner's filing of the instant motion constitutes a waiver of its jurisdictional claim of improper service. Pl.'s Mem. Opp'n Time Warner's Mot. Quash, ECF 22 at 16. This argument is specious. The federal rules permit defendants to simultaneously seek relief and raise a jurisdictional defense without waiver. *See* FED. R. CIV. P. 12(b)(2), (4)-(5) (defendant may move for dismissal based on the court's lack of personal jurisdiction, the insufficiency of process, or the insufficiency of service of process). It simply would be unfair to treat a motion premised on a jurisdictional objection as simultaneously operating as a waiver of that very objection. *United States v. Ligas*, 549 F.3d 497, 503 (7th Cir. 2008) (party's motion to quash does not mean that by making the motion he waived his objection to personal jurisdiction, citing *PaineWebber Inc. v. Chase Manhattan Private Bank (Switz.)*, 260 F.3d 453, 461 (5th Cir. 2001); *Neifeld v. Steinberg*, 438 F.2d 423, 425 n.4 (3d Cir. 1971) (declining to find defendant waived jurisdictional objection

(TIME WARNER CABLE, NOTES FOR LAW ENFORCEMENT AND PSAPS WHEN SERVING SUBPOENAS, COURT ORDERS, AND OTHER LAWFUL PROCESS ON TIME WARNER CABLE SEEKING HIGH-SPEED DATA (INTERNET), TELEPHONE, AND VIDEO SUBSCRIBER DATA (Nov. 16, 2010), *available at* http://www.timewarnercable.com/corporate/subpoena compliance.html.). The website referenced by plaintiff provides guidance only for subpoena requests from "law enforcement and PSAPs." PSAP is an acronym for "Public Safety Answering Points," which are emergency call centers responsible for answering calls for police, firefighters, and ambulance services. The website does not apply to the subpoenas issued in civil legal proceedings and is not intended to apply to the plaintiff. Plaintiff's contention that Time Warner waived FED. R. CIV. P. 45(b)'s requirements for proper service for all subpoena requests through directions to law enforcement and emergency personnel on this website is therefore baseless.

when it filed a motion to extinguish a writ of attachment and a motion to dismiss for lack of jurisdiction).

The Court grants Time Warner's motion to quash the subpoena in *Maverick* because the plaintiff did not abide by the requirements of Rule 45(b)(1) and personally serve its subpoena to a named person. The plaintiff is granted leave to re-issue its subpoena to Time Warner within ten days from entry of the order quashing the subpoena. If plaintiff fails to serve its subpoena within 10 days and file proof of service with the Court, the putative defendants listed in the plaintiff's original subpoena to Time Warner, dated September 14, 2010, shall be dismissed.

## CONCLUSION

For the reasons set forth above, the Court DENIES Time Warner's Motions to Quash the Subpoena in *Wild*, No. 10-cv-455, and *Donkeyball*, No. 10-cv-1520; and GRANTS Time Warner's Motion to Quash in *Maverick*, No. 10-cv-569. An Order consistent with this Memorandum Opinion will be entered.

**SO ORDERED**.

March 22, 2011                                    /s/ *Beryl A. Howell*

                                                 BERYL A. HOWELL
                                                 United States District Judge